Okay, I hear you now. Can you hear us? We can hear you, yes, we can, and Mr. Wetmore is here. Great, good morning. Ms. Hack, this is, what's the name of your client? Narayan Chetri, your honor. All right, Chetri v. Lynch, and ready to begin. May it please the court, Maliha Hug on behalf of Petitioner Mr. Narayan Chetri. I wanted to thank the court first for allowing me to appear via videoconference today. As for Mr. Chetri, he is before this court to submit that the record compels the conclusion that his application for asylum should have been granted by the agency. The agency's first reason for denying his application was that petitioner's harm that he faced in Nepal did not rise to the level of persecution. However, petitioner submits that this is not supported by evidence in the record. In April 2008, he was brutally beaten by Maoists in Nepal over a 45-minute period with an iron rod, which left him bleeding, bruised, and unable to walk. He was stabbed twice, had his hands and feet tied to a tree as he was being beaten by the rod, and the stabbing left him with permanent scars. His injuries required hospitalization for three days and seven to eight stitches. Now, the IJ found that this attack did not amount to persecution because petitioner, quote, remained unaffected at all by this act of violence since he continued farming and his political activities after this incident. However, the record does not support that conclusion that he remained, quote, unaffected at all. It does support that he continued his work and that he continued his political activities, but it does not, there's nowhere in the record that shows how long it took him to get back to his activities. It does say that he returned home after his hospitalization of three days, but thereafter there's no questioning and there's no evidence in the record that shows how long it took him. Could have taken him a year or maybe up to two years to get back to normal activity. Now, in a similar situation in Nakibuka v. Gonzalez, that's 421F3rd473, this court reversed the IJ in that case where the IJ found that Nakibuka was not affected by the one incident of violence against her because she remained in the house where the attack happened and she continued her job there as a housekeeper. Now, this court reversed the IJ saying that her decision not to flee immediately does not mean she was not persecuted. The situation is similar here. The attack was serious enough and had an imminent danger of death. In fact, before leaving, the attackers gave him a death threat saying that the next time they will kill him. And that is also similar to Nakibuka where the court reversed the IJ saying that even though it was one incident of violence, it was serious enough because it had an imminent risk of death since she had a gun pointed to her head. Here also Petitioner was stabbed multiple times which could have killed him, had an imminent risk of death in this attack. In addition, this was not an isolated incident. Two years later, Petitioner received a call in June 2010 threatening him to support the Maoists or he would not be spared. That call was not random. Petitioner was specifically targeted because of his leadership position in the Nepali Congress Party. And this attack and the call occurred against the backdrop of other local leaders in the Nepali Congress Party being targeted by the Maoist Party. Targeted meaning they were kidnapped and being killed. Petitioner testified about two of his friends whom this happened to who were kidnapped and killed. He also listed a number of people in his declaration whom he knew who similar things had happened to and they were also from the Nepali Congress Party. Neither the IJ nor the board took this into account. And although the call happened two years after the attack, it does not mean it was an isolated incident. And certainly together with the attack, the harm that Petitioner faced from both of these incidents rises to the level of persecution. The second reason why the agency denied Petitioner's application was that they found that the government in Nepal was able to protect him because there was a police investigation that was started. However, the IJ and the board speculate that or basically have no evidence of assuming that the investigation was carried out in good faith. The investigation that happened into his attack occurred in April 2008 after the elections in which the Maoist Party rose to power. The Maoist Party controlled the constituent assembly which is the main assembly in Nepal. It controlled the Prime Minister's party and the government was controlled by the Maoist Party. And in this context, the police had no incentive to really go after the people who were attacking the Maoist opponents. And moreover, the record is full of examples as about evidence that the Nepalese government is unable to control the Maoist violence. State Department report in the record at AR 236 states that Maoists were believed to be involved in 170 unresolved disappearances and the government had not prosecuted any involvement as of the date of that writing. So the government, if not unwilling, was at least unable to control Maoist violence and thus unable to help Petitioner. Finally even if Petitioner did not meet his burden to show that the harm he faced in Nepal rose to the level of persecution, he did meet his burden of showing that his fear of future persecution is well founded. Given the objective country conditions evidence in the record regarding ongoing Maoist violence and his credible testimony regarding the severe harm he faced in the past, there is reasonable possibility that he will be persecuted in the future. The IJ conducted absolutely no analysis on the issue of future persecution and the board determined that there is no evidence that anybody is targeting Petitioner even though it did recognize that his wife was receiving anonymous calls and his father was accosted by a Maoist who wanted to know about Petitioner's Given these two facts, given the context, given the objective country reports, any reasonable fact finder would find that Petitioner had a reasonable fear of future persecution if he is forced to return to Nepal. Counsel, I thought the evidence suggests and the board specifically focused on this with respect to the claim of future persecution that the Congress party is now ascendant apparently. Is that right? And the Maoist party has transitioned to a more mainstream group and they've signed a truce of some sort with the new government so that the problems that existed at the time of this attack no longer exist? Your Honor, the board cites to support that IJ decision and also Petitioner's own declaration and yes, that does show that the Nepali Congress party had a role to play in the government. However, the citation that the board relies on shows that the Nepali Congress party had the president and the vice president's position in the government. However, the prime ministership at the time that the board is talking about was controlled by the Maoist and so was the constituent assembly. If you look on page AR 185, that is what the board cites to as the respondents' declaration and they cite to in the middle of the page and that's what it talks about that the Nepali Congress party had the president and the vice president's position but that Pushpa Kamal Dahal Prachanda from the Maoist party was appointed as the prime minister. So I would submit, Your Honor, that the country conditions show that the Maoist party were in power and are in power, at least that's what the record supports as of right now. Isn't the current legislature primarily dominated by Nepali Congress? Party representatives? In other words, your clients? The party is now in control, the Maoist party only has some 26 seats, something like that? Your Honor, I'm not sure where that is in the record. This is the current conditions as opposed to the conditions that prevailed at the time. Your Honor, even if that is the case, I would have to submit that the Maoist party has not been taken into, has not been brought under control, that the violence still continues. From what I understand of the current reports, there is ongoing violence in the country regarding the making of the constitution there, and I believe the Maoist party is still active in Nepal, and that petitioner would still be in danger if he's forced to return. Is there any indication that the government would be unwilling to, or unable to protect him from the Maoists? Well, yes, Your Honor, I mean, in the record there is plenty of evidence that shows that the Maoist party continued their attacks unabated. But he neglected to call the police. Your Honor, he was, the police were called the first time after he was attacked, and given the fact that he, that nothing resulted from that, there was no outcome, it was entirely reasonable for him to assume that if such a severe attack led to no outcome for him, or no positive outcome, that the police were useless to help him. So and then he, that's when he chose to flee the country, after the phone call, that he realized that he was not, he'd be able to be protected in Nepal. Thank you, Captain. Thank you, Your Honor. May it please the Court, David Wetmore for the Attorney General. Your Honor, substantial evidence does support the agency's denial of each of the petitioner's applications for relief and protection. Specifically... Excuse me, Mr. Wetmore, just a minute. Ms. Hack, can you see Mr. Wetmore? I cannot, Your Honor. I can't see him, no. I can see you. Can you hear him? Can you hear him?  Yes, I can hear him. Yes, thank you, Your Honor. All right. Do you have a, do you have a screen to see him on? I do, I can't see him, Your Honor. I think the only camera on your court is pointed at the bench. All right. Thank you. Thank you. Can you see the bench? Yes, Your Honor, I can. Why don't you come up here? I prefer to be anonymous. If you can hear him, we'll proceed.   Thank you. Okay. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, Your Honors. Getting back to whether the mistreatment the petitioner suffered rose to the level of torture, we submit that the substantial evidence shows that it didn't. There are numerous cases here that are almost on point discussing instances where there was a single isolated act of physical mistreatment that did not, in fact, result in any prolonged harm. We've cited those in our brief. I won't rehash them. I would also refer the court to petitioner's brief where they cited no analogous cases finding that mistreatment that he's alleging would rise the level of persecution. With regard to how long it took him to return to normal after his mistreatment, it's his burden to show that. And he simply didn't put that evidence in the record. When asked, he said after he left the hospital after three days, he returned to his political activities and his farming. If he wants to put in any additional evidence with regard to any mistreatment, you know, after effects of that mistreatment, lingering effects, it's his burden to do so. He failed to do so. That argument was also not raised below, and therefore, it was not exhausted. It's also completely undisputed that the individuals who mistreated the petitioner were, quote, common citizens. They were private individuals. And the government, the Nepali government, made substantial efforts to look for these individuals. In fact, they instituted an investigation commission. Your honors were correct that petitioner never actually called the police. In fact, the police came on their own accord after seeing a press release by the party and at that point came and interviewed him in the hospital. Petitioner conceded that he never actually gave them a physical description of his attackers. He did not recognize them. He didn't know who they were. And he merely told them that he believed that they were from this Maoist youth party. At that point, the political party put pressure on the police. They formed the investigative committee. And when asked whether he was satisfied with this investigation, petitioner said, I quote, it was satisfactory to my knowledge and belief. So there's no indication as- The police, as I understood it, interviewed him in the hospital, right? That's correct, your honor. And he was in the hospital for three days? Three days. So they acted relatively quickly. Yeah, they acted expeditiously. They came in, they investigated, they formed the committee, and they really had nothing to go on. They didn't have the descriptions of the individuals. When asked if he followed up with the police, made any additional effort to catch these And as this court has held before, if the police make an effort, even if they don't catch the individuals, that does not show that they are unwilling or unable to tackle this problem. Then, two years go by, he goes back to his exact same situation. He goes back to farming, he goes back to his political activities. Absolutely nothing happens. So he did express some concern that if he went further with the police in 2008, that he might face a reprisal. The evidence clearly shows that wasn't the case. And his fear was completely unfounded. Then, out of the blue, as he states, he suddenly received a phone call. The individual identifies himself and identifies the office from which he's calling and makes a vague threat that in 10 days, we may physically harm you if you don't switch sides. He doesn't report this to the police. He doesn't report this to the party. The party is in power at that time. The record clearly establishes that. And he made no effort whatsoever to allow the police to go and knock on this person's door. They knew where to find him. They knew who this individual was. And there were 10 days for them to go ahead and abrogate any sort of harm that he potentially faced. Instead, he elected to leave the country, spend tens of thousands of dollars traveling on a sort of cross-continental journey, and ultimately show up on the Mexican border. I mean, he simply could have called the police. It's his obligation to do so. They have to have a chance in this case. Because he didn't give them that chance and because they clearly showed that they are willing to do something to combat these malice, the country conditions say the exact same thing. He failed in his burden to demonstrate his eligibility for asylum, as well as withholding of removal. And the country conditions, in fact, demonstrate that if we look to the 2002 United Nations High Commission on Human Rights report that is in the record at page 299, it indicates that the Carter Center found broad consensus that incidents of political violence remain. Political space in Nepal has opened up since the 2008 Constituent Assembly elections and that the political parties were generally able to conduct their public and internal events without interference. This assessment is corroborated by the United States, the United States, excuse me, the U.S. Department of State. We submit that that's ample evidence that the government is willing to do something. Conditions have improved and substantial evidence supports a denial of the petition for review. That's as of 2012? That was the 2012 report, yes, Your Honor. And as you noted correctly, that the current premier of Nepal is from Petitioner's Party in the Nepali Congress, as it was in 2010 when this other incident allegedly occurred. And it was shortly after, in 2008, as the Maoists resigned their position and the Nepali Congress took the prime ministership. The court has no further questions. We'll submit on the briefs. Thank you, Mr. Witt. Ms. Hack, since we're doing this by video, I'll give you another minute if you have any response to... No, Your Honor, we'll submit. We'll submit on the brief. Thank you. Thank you very much. The case will be taken under advisement. And the court will be in recess. Thank you very much.